997 A.2d 793

Adan Espinoza CANELA & Policarpio Espinoza Perez

v.

STATE of Maryland.

Nos. 1719, 1944 Sept. Term, 2006.

Court of Special Appeals of Maryland.

July 1, 2010.

**260**

Brian J. Murphy (Elizabeth L. Julian, Acting Public Defender, David Kennedy, on the brief) Baltimore, MD, for appellant.

Diane E. Keller (Douglas Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: *SALMON, EYLER, DEBORAH S., and WOODWARD, JJ.

JAMES P. SALMON, J.

In May 2004, Lucero Espinoza ("Lucero"), age 8, and her older brother, Ricardo Espinoza, Jr. ("Ricardo Jr."), age 9, lived with their parents in an apartment located on Park Heights Avenue in Northwest Baltimore. Also living in the same apartment were Lucero's and Ricardo Jr.'s cousin, Alexis Espenjo Quezada ("Alexis"), age 10, and Alexis's mother, Maria Andrea Espenjo Quezada ("Maria"). At that time, Lucero, Ricardo Jr. and Alexis were all students at Cross Country Elementary School in Baltimore City.

On the afternoon of May 27, 2004, the three children returned to their apartment after school. The children were alone in the apartment that afternoon when a person or persons invaded the apartment and brutally murdered all three of them. Ricardo Jr. and his cousin Alexis were hit in the head with a blunt object and strangled. Lucero was also bludgeoned. All three children had their throats slit.

Several hours after the murders, Adam Espinoza Canela ("Canela") and his uncle Policarpio Espinoza Perez ("Perez") were arrested for the murders. The two were tried before a

---

* James P. Salmon, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

jury in July and August 2005 on three counts of first-degree murder and three counts of conspiracy to murder. The jury could not agree as to a verdict and a mistrial was declared.

A second jury trial commenced on June 22, 2006. The trial lasted over six weeks. More than twenty witnesses testified and over 300 exhibits were introduced. On August 8, 2006, after four days of deliberations, the jury found both Canela and Perez guilty of two counts of first-degree murder, one count of second-degree murder and three counts of conspiracy to commit murder.

Canela and Perez received the same sentence, viz: two consecutive terms of life in prison without the possibility of parole for the first-degree murder convictions and a consecutive thirty-year sentence for second-degree murder; a life sentence was also imposed for all three counts of conspiracy to commit murder, but that sentence was to be served concurrently with the other sentences.

Canela and Perez each filed separate appeals. On April 29, 2008, we granted the State's motion to consolidate these appeals.

On August 15, 2008, we remanded the cases to the Circuit Court for Baltimore City, pursuant to Maryland Rule 8–413(a), with directions to the circuit court to conduct a hearing to resolve factual issues concerning whether certain notes from the jury had been shown to defense counsel by the trial judge, the Honorable David B. Mitchell.

In late January 2009, the Honorable Dennis Sweeney commenced a three-day hearing to resolve the issue of which notes had been shown to counsel. On April 16, 2009, Judge Sweeney filed an opinion in which he found that Judge Mitchell, in contravention of Maryland Rule 4–326(d), had failed to show counsel six notes that were sent to him from the jury.

In this appeal, four questions are raised by Canela and Perez jointly; Canela raises one question not raised by Perez; and Perez raises three additional questions. These questions will be discussed, in detail, *infra.*

## I.

## Background Facts

At the time of the murders, Canela, age 17, and his uncle, Perez, age 22, were roommates. They lived in a house on Bedford Road in Baltimore. Their house was located a few miles from where the murdered children lived.

The parents of two of the murder victims (Lucero and Ricardo Jr.) were Ricardo Espinoza Perez, Sr. ("Ricardo Sr.") and his wife Noemi Quezada Morales, who is known by her nickname, "Mimi." Ricardo Sr. and Mimi owned and operated a lunch wagon that served construction sites in the Baltimore metropolitan area. Maria, the mother of Alexis, worked on another lunch wagon that was owned by Ricardo Sr.'s brother. Mimi, Ricardo Sr., and Maria, the parents of the murdered victims, were all immigrants from Mexico. None were proficient in English.

After finishing work on May 27, 2004, Ricardo Sr. and other family members stopped on the way home to buy meat and then went to a bank. After these errands were performed, Ricardo Sr., his wife Mimi, and Alexis's mother, Maria, along with two other family members, returned to the Park Heights Avenue apartment where the three murder victims lived. The parents were driven to the apartment by Ricardo Sr.'s sister-in-law. After unloading their purchases, Ricardo Sr. rang the doorbell of the apartment because he had forgotten his key. When there was no answer, Ricardo Sr. entered the ground-floor apartment through the kitchen window. Once inside, he discovered the corpses of the three children and ran out the front door. A neighbor called "911" at 5:21 p.m.

The police arrived promptly. They found that the kitchen window had been opened and the screen pushed in. A dining room window was also open. Blood stains were found in various places in the apartment. An impression identified as having been made by a glove was found on the front of a drawer. A knife and aluminum bat, which were later proven to have been used in the killings, were found wedged between

a wall of the garage and a fence post separating the rear of the apartment complex from an adjacent school yard.

Because of the horrific nature of the crime, a large number of people, including representatives of the media, quickly gathered near the scene of the murders. Soon after the police arrived, Dana Jones, a neighbor, told Baltimore City Detective Ervin Bradley that two days previously, at about 10:00 p.m., she saw two men coming out of the bushes near the rear of the victims' apartment, and then saw them peeping in the windows and acting suspiciously.[1]

As other family members began arriving at the murder scene, they were taken into a conference room in the rental office of the apartment complex. Ultimately, about fifteen family members voluntarily went into the conference room, where they were interviewed by Detective Bradley, with Officer Juan Diaz serving as interpreter. The relatives were asked simple questions such as their names, the last time they had seen the murder victims alive, and where they were employed. At that point, the police did not ask for details.

Among the family members that were interviewed were Perez (the uncle of Ricardo, Jr. and Lucero) and Canela (cousin of Ricardo Jr., and Lucero). While other family members looked as if they had just come from work, Canela and Perez both arrived with wet hair and, according to later testimony by police officers, looked as if they had recently showered. Perez told the detectives when interviewed at the apartment complex that he was working that day and that when he got off from work "he went down to Broadway and Central." On the other hand Canela claimed that he "was with his uncle Poli [i.e., Perez] and they stayed home (on the days of the murders) and watched TV all day."

---

1. She was later to testify at trial that on the afternoon of the murders, at about 4:20 p.m., she was leaving her apartment when she saw one of the victims, Alexis. He had opened the door when she passed the apartment. Ms. Jones admonished him to keep the door closed "so that the cicadas would not get in." He closed the door and Ms. Jones left.

Later in the evening, Dana Jones, who lived near the victims' apartment, told Detective Bradley that she had seen Canela and Perez arrive at the apartment complex after the police arrived and recognized them as the men that she had seen two days earlier coming out of the bushes near the rear of the victims' apartment.

After the interviews at the scene were completed, family members were told that the police needed to interview them at the homicide unit's headquarters and that police officers would provide transportation. Some relatives drove themselves to the police station; others, including appellants, were transported in police vehicles.

All family members, even those who drove themselves to the police station, were escorted into the homicide unit by uniformed police personnel. Perez and Canela were placed in adjacent holding cells to await their interviews. The doors to the holding cells were not locked or even closed, and neither appellant was handcuffed or restrained in any way. As other family members arrived, they were placed in various cubicles or offices throughout the homicide unit.

Detective Sergeant Darryl Massey interviewed Perez and Canela separately with Detective Juan Diaz translating. Prior to questioning, both Canela and Perez were fully advised of their *Miranda rights* [2] and each executed a written *Miranda* waiver. The detective questioned Canela first, then Perez. Canela denied any involvement in the crimes and denied that he had been at the children's apartment on the day of the murders. Perez, however, told the detectives that he and Canela drove to the apartment complex where the children lived on the afternoon of the murders. They arrived at approximately 4:20 p.m. The two went to the apartment because Canela said that he had something to discuss with his uncle, Ricardo Sr. Perez stayed in his car, which was parked in the back of the apartment complex, while Canela went

---

**2.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

inside. According to Perez's statement given to the detectives, Perez saw Canela come out of a rear window of the apartment about twenty minutes after he had entered the apartment; Canela, who at that time was not wearing a shirt, told Perez to drive around and pick him up at the adjacent high school; Canela then climbed over the fence that separated the apartment complex and the school yard. Perez further related in his statement that Canela told him that he left the apartment through the back window because he had been playing with the children and that he threw his shirt away because it was dirty. Perez also told the detectives that, after he picked Canela up in the school yard, the two drove to Fells Point, where Canela purchased a shirt; the two then walked around until they received a phone call informing them that something bad had happened at the apartment where Ricardo, Sr. lived; they then immediately drove back to the Ricardo Sr.'s apartment.

After Perez and Canela were arrested, Baltimore City Police Officers obtained a warrant authorizing the police to search the Bedford Road house where both appellants lived. During the execution of the warrant, the police seized from the room in which Perez and Canela slept a pair of blue jeans, referred to in the testimony as "Route 66" jeans. Those jeans were observed to have apparent blood stains with a knife impression. From Perez's car, the police recovered two gloves and a pair of blue jeans known as "No Boundary," or "Snow Boarder" jeans, which were also stained with blood. DNA from the blood stains on one of the gloves was found to be consistent with a mix of the DNA of the murder victims and Perez. Micro-vacuum samples extracted from interior surfaces of the gloves yielded DNA that was consistent with a mixture of DNA from the victims and Perez. Micro-vacuum samples taken from interior surfaces of the "No Boundary" jeans yielded DNA that was consistent with a mixture of DNA of the victims and Canela. In addition, DNA from the bloodstain on the "No Boundary" jeans were found to be consistent with Lucero's DNA. Micro-vacuum samples taken from interior surfaces of the "No Boundary" jeans also yielded DNA that

was consistent with DNA from Perez. A 1/32–inch speck of blood contained DNA that was consistent with Lucero's DNA. That blood speck was found on one of the shoes seized from Perez after he gave his statement to the police.

As already mentioned, some of the DNA evidence in this case was obtained from samples collected from interior surfaces of gloves and blue jeans. These samples were recovered by using a small vacuum collecting device invented by Salvatore Bianca, an expert in the field of trace analysis, forensic serology, blood spatter and impressions. The reliability of the vacuum collecting device was the subject of a Frye/Reed hearing before the first trial. The result of the Frye/Reed hearing was adverse to appellants. At the second trial, appellants elected not to renew their motion to exclude evidence collected by that device.

At the second trial, Mr. Bianca described the device in detail and named other laboratories that used it. Earlier in the second trial, a serologist named Terry Levy, testified that she regularly used the device because it was the best method for recovering any trace evidence that might be present. According to Levy, the vacuum method was generally scientifically accepted. Additionally, David Exline, a forensic scientist for the RJL Lee Group, who was accepted by the court as an expert in trace evidence analysis, testified, without objection, that, to a reasonable degree of scientific certainty use of the apparatus to recover trace evidence was a valid technique. According to the State's evidence, the vacuum device, when used on interior surfaces of the gloves and blue jeans, was capable of drawing blood cells deposited on the outside of an item through the fabric, and simultaneously collecting skin cells left on the inside of the item by the person or persons who had worn the item. The validity of this scientific proposition was contested by the appellants at trial.

Additional facts will be set forth in order to resolve the numerous contentions raised by appellants in this appeal.

## II.

### First Joint Issue—The Jury Notes

Md. Rule 4–326(d) provides:

*Communications with jury.* The court shall notify the defendant and the State's Attorney of the receipt of any communication from the jury pertaining to the action as promptly as practicable and in any event before responding to the communication. All such communications between the court and the jury shall be on the record in open court or shall be in writing and filed in the action. The clerk or the court shall note on a written communication the date and time it was received from the jury.

 This rule is mandatory and must be strictly followed. *Taylor v. State,* 352 Md. 338, 345, 722 A.2d 65 (1998). A violation of Rule 4–326 is a violation of the defendant's right to be present at every stage of the trial. *Id.* A conviction cannot be upheld if the record discloses a violation of this right, *Stewart v. State,* 334 Md. 213, 225, 638 A.2d 754 (1994), unless the State can show that the error was harmless beyond a reasonable doubt. *Denicolis v. State,* 378 Md. 646, 658–59, 837 A.2d 944 (2003). For the State to meet this burden, the record must affirmatively show that the communication was not prejudicial. *Noble v. State,* 293 Md. 549, 563, 446 A.2d 844 (1982).

Judge Sweeney issued a twenty-two page opinion in which he concluded that "[t]he contents of juror notes 6, 7, 14, 21, 23 and 26 were not disclosed to counsel by the court." The State does not contend that Judge Sweeney erred in reaching that conclusion. Appellants argue that by failing to disclose the six jury notes to defense counsel, Judge Mitchell committed reversible error because the State cannot show that the error was harmless beyond a reasonable doubt. Citing *Denicolis, supra,* the State agrees that Judge Mitchell erred in not showing the notes to counsel, but nevertheless contends that the error was harmless beyond a reasonable doubt.

274

 "[N]ot every error committed during a trial is reversible error." *Moore v. State*, 412 Md. 635, 666, 989 A.2d 1150 (2010). In *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976), the Court of Appeals set forth the applicable guidelines to be used in making a harmless error analysis, viz:

> We conclude that when an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

(Footnote omitted.) *See also Parker v. State*, 408 Md. 428, 446, 970 A.2d 320 (2009). "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record." *Bellamy v. State*, 403 Md. 308, 332, 941 A.2d 1107 (2008) (quoting *United States v. O'Keefe*, 128 F.3d 885, 894 (5th Cir.1997)).

With the aforementioned standard in mind, we shall consider each of the six notes at issue to determine whether the State met its burden of showing that the error committed by Judge Mitchell was, beyond a reasonable doubt, harmless.

### A. Notes Six and Seven

 Both of these notes were received by the trial judge while Ricardo Sr. was testifying. Note 6 was received on July 7 at 10 a.m.; note 7 was received on the same date at 11:11 a.m.

Immediately prior to the receipt of note 6, Ricardo Sr. testified that, on the date of the murders, around "4:00 or 4:20," he, his wife and Maria, along with two other family members, were returning home from work. He testified that on the way home they stopped at a bank, and after arriving at

the apartment they unloaded several items that they had purchased. At about this point, a juror wrote note 6, which read, "when were these things purchased? When everybody got out of the car to carry stuff to the house[?]"

Upon receipt of note 6 the following exchange took place:

The Court: You purchased some items before coming to the apartment. What did you purchase and where did you purchase them?

The Interpreter: With the Court's permission? Your Honor, the interpreter would like to say the word that he's trying to pronounce we're not understanding precisely comes out something like Rogers Precision. It may be a name but we're not sure. The statement made by the witness was we bought several things for the house at Rogers Precision, jewels—they sell jewelry, pants, phones, kitchen items, things like that.

The Court: Continue.

[Prosecutor]: Did you do that on your way home that day?

[Ricardo Sr.]: I just am not—

The Interpreter: The first part—the interpreter would like to say that the first part of the response again is I can't understand what's being said, Your Honor, and then he says I don't know what you mean. Did you mean did we buy them on the way or I don't know what you mean.

[Prosecutor]: I'll move on, Your Honor.

Later, but still during Ricardo Sr.'s testimony, a juror wrote note 7, which read:

Please I need to know *when* these things were purchased. If they only made two stops: 1. Bank 2. The babysitters house 3. Home.

The following colloquy then occurred:

The Court: One moment, please. Mr. Espinoza, the Court returns to the items—to the area of inquiry regarding the items that you purchased that day or purchased. These are the items that you and your family put on the curb before you attempted to enter your apartment. Sir, my question is

did you purchase those items that day or did you purchase those items on another day?

[Ricardo Sr.]: Well, it was outside the door, was some meat and I think we had a pork shoulder or something and I think there was some bread. I don't remember exactly what it was we had that day.

The Court: My question is did he purchase those items from a store or acquire those items from some place on that day or did he acquire them on a previous day, if he remembers?

[Ricardo Sr.]: If it was meat we would have bought it that day.

The Court: Do you specifically recall when you purchased it?

[Ricardo Sr.]: Well, if it was meat and we were coming home from work and we were going to prepare something for the next day, but if we're talking about casseroles or the pops that I mentioned before that would have been a month ago, a month before that or twenty days before.

The Court: Do you have a direct recall of making these purchases or are you making an assumption of when you may have done this?

[Ricardo Sr.]: That's what I mean, if it was the meat, it was that day. The meat was that day.

The Court: Do you know if—does the witness recall whether he purchased that meat, if he did purchase meat, before he went to the bank or did he purchase it after he went to the bank?

[Ricardo Sr.]: No, it was before we went to the bank.

The Court: Thank you. Are there questions from the government based on the Court's questions?

The Prosecutor and defense counsel then said that they had no questions based on the judge's questions.

The State argues:

Notes 6 and 7 asked for clarification of the testimony of Ricardo [Sr] ... father of two of the victims, regarding

purchases that he said he and other family members had made on their way home from work on the afternoon of the murders. They put these purchases down on the curb before attempting to enter their apartment. Questioned by the court, the witness answered the question, explaining that meat was purchased that day, before they went to the bank.

As Judge Sweeney found, "[c]ounsel were given full opportunity to pose any questions on this subject before the witness left the stand." If defense counsel thought the matter had some additional significance they were free to pursue the matter further. They did not do so.

In short, the evidence about the time of the purchases was placed before the jury, and counsel were free to respond to it as they wished. Knowledge that the jury requested clarification on this minor point, rather than trial court, would not have triggered some readjustment of the defense trial strategy. The record affirmatively establishes that the error in failing to disclose these notes about the timing of the purchases would have had no effect whatever on the jury's verdicts.

(Reference to record omitted.)

Appellants, in regard to notes 6 and 7 (as well as other notes), assert that "knowing that jurors had particular concerns as reflected in these notes would have been important information for counsel." Appellants go on to argue that these two notes "reflected precise and important substantive concerns the jury had with the evidence in the trial." According to appellants, if they had known that the questions emanated from the jury they would have been able to "adjust their trial strategy or ... request that the trial judge allow them, rather than the trial judge himself, to undertake the required follow-up questioning of the witness."

The issues that the jurors wanted clarified were these: 1) when were purchases made; 2) how many stops Ricardo, Sr. and his family members made after they got off from work on the day of the murders; 3) the order in which they made those

stops; 4) whether meat was purchased before or after they went to the bank. All of these questions involved very minor issues that had nothing to do with the guilt or innocence of appellants. If defense counsel had received the notes prior to the judge asking his questions, it is impossible for us to see how defense counsel might have conceivably changed their trial strategy, nor is it conceivable that the jury verdicts might have been different if defense counsel rather than Judge Mitchell cleared up these minor details. We therefore hold that the error in failing to show notes 6 and 7 to counsel was harmless beyond a reasonable doubt.

### B. Jury Note 14

■ On July 13 at 9:40 a.m., which was prior to the start of testimony that day, Judge Mitchell received jury note 14, which read:

> We the juror[s] feel that juror # 6 should be removed, because of lack of concentration and constantly nodding during this trial. Two men['s] lives are at stake and we believe they deserve a fair trial.

Two minutes after jury note 14 was received, the trial proceedings went on the record, but Judge Mitchell did not advise counsel of the note. Instead, Judge Mitchell and counsel discussed what should be done because juror # 6, the inattentive juror, had not arrived even though it was past the time the court had set for trial to recommence.

Without knowledge of the note, defense counsel argued that juror # 6 should not be dismissed and that more time should be allowed for the juror to get to court. Judge Mitchell initially decided to wait. But when juror # 6 had not arrived after a little more than an hour had passed, Judge Mitchell dismissed juror # 6, who was replaced with an alternate. Appellants do not argue that the court erred in dismissing juror # 6.

Appellants argue:

> [U]ndisclosed note 14 reflected information that would have made a crucial difference in counsel's trial strategy at

a particular juncture in the case. The transcript of the morning of July 13 shows that defense counsel fought long and hard to keep Juror # 6 on the jury by imploring the court to wait longer and longer for him to arrive. This resulted in the jury being held in the jury room for an inordinate amount of time before the start of trial proceedings that day, very likely to their substantial annoyance. Defense counsel would never have risked thus aggravating the jury had they known that jurors who were willing to express their concern for a fair trial for defendants had requested that juror # 6 be removed.

It is true, as appellants claim, that failure to disclose note 14 to counsel, in all likelihood, delayed the trial by over an hour. Nevertheless, because there was nothing that could have possibly suggested to the jurors that the delay was caused by the appellants or their trial counsel, it is impossible to believe that the jurors would have blamed either the defendants or defense counsel for the delay. Moreover, even if news somehow "leaked" to the jury that defense counsel caused the delay, we agree with the State that "[i]t borders on the absurd to suggest . . . [that any juror] would have convicted [a]ppellants of the heinous crimes charged because of a belief that defense counsel caused a delay of a little over an hour."

We therefore hold that failure to disclose jury note 14 to counsel was harmless beyond a reasonable doubt.

## C. Jury Note 21

■ Before discussing the contents of note 21, some additional background information is necessary.

At the time of the murders, Perez's cell phone number was 443–220–5630. In support of the State's theory that Perez was present at the apartment at about the time the murders occurred, the State called Bruce Levine, a regional performance and optimization engineer for Sprint Corporation. Mr. Levine was qualified as an expert and was allowed to explain to the jurors where Perez's cell phone, and the cell phones of other family members, were located when various calls were

made or received. During Levine's testimony, Judge Mitchell was given jury note 21, which read: "when you say call 'received' does that mean the call went through and was answered at other end?"

After he was given note 21, Judge Mitchell said: "we're going to take our lunch and recess at this hour but before we do, ... I have one question [of Mr. Levine]. You frequently ... use the word receive. Would you define what you mean when you say received?" The following exchange then occurred:

Mr. Levine: That is where the signal—excuse me—that is where the signal from the phone is—without using the word received—

The Court: Does it mean that it's accepted—let's use the word accepted.

Mr. Levine: It means it's accepted by the system on a particular set of antennas and equipment that is associated with those (indiscernible). So it is accepted on a particular piece of that tower (indiscernible). I mean coming into and accepted at a particular slice of the pie wedge.

The Court: That's—does that—the time that you refer as is the time when the call was received, or placed, means that's when it was accepted or at—at that—at your facilities?

Mr. Levine: That's the record that is in our billing file, *so that is what our system considers to be the start of that phone call.*

The Court: And what does a duration mean?

Mr. Levine: The duration is the time that phone call lasts.

The Court: Can you tell from—in any way from a duration whether a telephone call was—was answered?

Mr. Levine: No there is—well, on an outbound phone call, you know that somebody had to hit send so they made that phone call. On an inbound phone call, there is nothing in

the record that indicates whether or not somebody actually answered the phone. . . .

(Emphasis added.)

On cross-examination, Perez's counsel further developed these points, which established that some of the many phone calls about which Levine testified might not have resulted in actual conversations. Canela's counsel did not cross-examine Levine.

In regard to note 21 the State argues:

This record demonstrates that the court did just what it intended to do, clarifying the meaning of the term "received" for the jury, and that defense counsel followed up on the matter as they sought [sic] fit. Again this was a minor matter, particularly in view of the clarification provided. Knowledge that the jury, rather than the court, posed a question asking for the meaning of "received" phone calls did not generate a need to "adjust" [a]ppellants' trial strategy.

Appellants do not make a specific argument directed at jury note 21. They do, however, argue, generally, that "knowing that jurors had particular concerns as reflected in these notes would have been important information for counsel." Later in their brief, they argue that this note, like others, "reflected precise and important substantive concerns the jury had with the evidence in the trial." Once again they argue that they could have used this information "to adjust their trial strategy" or, alternatively, ask the trial judge to allow them to ask the follow-up questioning of the witness.

We fail to see how appellants were prejudiced by the way that the trial judge handled jury note 21. The jury simply wanted to know what the word "received" meant when Mr. Levine used that term. In answer to the question, Mr. Levine defined the term as "the start of that phone call." Appellants do not suggest that the definition given was incorrect or that cross-examination might have developed a different answer. Under the circumstances, the failure to advise counsel as to

the contents of jury note 21 was harmless beyond a reasonable doubt.

### D. Jury Note 23

■ Jury note 23 was received during the testimony of Mr. Bianca, the inventor of the vacuum that was used to extract DNA from the blue jeans and gloves found in Perez's car. The jury note read: "is it possible to vaccum [sic] those types of gloves? If possible[,] did you vaccum [sic] them one and two?"

During the hearing before Judge Sweeney, it was established that neither Judge Mitchell nor the other witnesses could recall receiving this note. And Judge Mitchell, himself, did not ask a question arising from note 23. The question, however, was answered by Mr. Bianca during the following exchange:

[Prosecutor]: Alright. What are we looking in the next picture, States 145?

[Mr. Bianca]: That's both gloves side-by-side, looking at the palms. Glove number 1, and glove number 2. See the large area right here of brown stains, thats [sic] human blood on number 2. Theres [sic] human blood on number 1 at the base of the thumb, and over here at the base of the palm.

\*　　\*　　\*

[Prosecutor]: Alright. And, Im going to get to that in a moment. But, what, if any, other evidence did you collect from these gloves?

[Mr. Bianca]: Okay. One other thing I did … Well, we wanted to know who was wearing these gloves. Thats [sic] an important concept. Inside, I didn't see any blood on the inside. *So I used the vacuum collector to go inside and collect inside the gloves.* Hopefully, to get something. Either skin cells, or dirt or debris or something that would have come off of the wearer of these gloves. *And I did both gloves.*

[Prosecutor]: And did you use the same vacuum method you already described?

[Mr. Bianca]: Yes, I did.

(Emphasis added.)

Additionally, as mentioned earlier, micro-vacuum samples taken from the interior surfaces of the two gloves yielded DNA that was consistent with a mixture of DNA from the victims and Perez.

In regard to jury note 23, the State argues:

This was one small bit of testimony regarding the extensive DNA evidence presented by the State. The jury's question was answered. Again, the record affirmatively disputes any suggestion that the knowledge that this question came from the jury would have generated some change in the defense strategy or in anyway effected [sic] the jury's verdict.

In their briefs, appellants make the same argument as to jury note 23 as they made in regard to all other notes except note 14. They claim that "knowing that jurors have particular concerns as reflected in those notes would have been important information for counsel." They also argue, in regard to all notes except note 14, that the notes "reflected precise and important substantive concerns the jury had with the evidence in the trial." Lastly, with regard to note 23 only, they point out that this note, unlike all other notes except note 14, did not result in a corresponding question from Judge Mitchell.

We fail to see how appellants were prejudiced by the failure to reveal the contents of note 23. After all, one of the important purposes of putting Mr. Bianca on the stand was to prove that the vacuum collection unit invented by him could be used to extract DNA from the two gloves found in Perez's car. Through the prosecutor's questioning of Mr. Bianca, the question posed in jury note 23 was answered. It is impossible to see how defense counsel could have revised their trial strategy or have otherwise done anything different in cross-examining Mr. Bianca, had they known that the same question asked by the prosecutor had also been asked by one of the jurors. We hold that under these circumstances it can be said, beyond a reasonable doubt, that the outcome of this case would have

been no different had defense counsel been advised of the contents of jury note 23.

## E. Jury Note 26

■■■ This jury note was sent to Judge Mitchell while Francis Chiafari, the State's DNA expert, was testifying. The note received by Judge Mitchell read as follows: "is it possible for another DNA expert to look at the same reports and have a different opinion?" After Mr. Chiafari had been crossed-examined, the following occurred:

The Court: Is it possible for another DNA expert to look at the reports that you generated and reach a different conclusion than what you have reached?

[Mr. Chiafari]: I don't believe that if another DNA expert is provided the data ... Meaning the peak heights and the charts and everything that they would reach a different conclusion in regard to consistent or inconsistent with presence on a particular sample.

There may be some conversation about statistics. What would be an appropriate calculation to perform. Whether we should expect that someone from the Baltimore area would substitute as, you know, a defendant, or I should say, as an alternative to the defendants, or whether there should be some other calculation performed.

But that doesn't change the conclusion that the profiles are consistent with the individuals listed.

\*　　\*　　\*

The Court: Does [defense counsel] have a question in light of the question from the Court?

[Perez's Counsel]: I do, Your Honor.

\*　　\*　　\*

[Perez's Counsel]: And, somebody else could interpret a similar data differently, could they not?

[Mr. Chiafari]: It's possible. Not very likely.

[Perez's Counsel]: Is that because, you believe your interpretations are correct?

[Mr. Chiafari]: Yes.

[Perez's Counsel]: But, someone could disagree with you about that?

\* \* \*

[Mr. Chiafari]: I don't think another expert would reach another conclusion.

[Perez's Counsel]: But, if someone were to review the analysis, they could?

\* \* \*

[Mr. Chiafari]: It's possible.

[Perez's Counsel]: I have nothing further.

Canela's counsel then cross-examined the witness as follows:

[Canela's Counsel]: So, when you say that you don't believe another expert would come to another conclusion than you, that conclusion would be based on them using the same testing methods as you?

[Mr. Chiafari]: Well, I was speaking of the same data. I mean, if we sit down and we re-test a portion of the mixture, as we discussed the other day, it is possible that one portion of the mixture may test slightly differently than another portion of the mixture. So, it's important to distinguish terms.

\* \* \*

[Canela's Counsel]: So, in reviewing your data, under the PENTA–E and PENTA–D system, you don't believe another expert would come to another conclusion?

[Mr. Chiafari]: Correct.

The State, in arguing that the failure to disclose jury note 26 to defense counsel was harmless beyond a reasonable doubt, asserts:

Appellants do not now assert that, had their trial counsel realized this question came from the jury, rather than the Court, they would have been likely to call a defense DNA expert. Instead, they merely state baldly as to all five

evidentiary questions that their trial strategy might have been "adjusted."

Appellants leave us to speculate as to how their trial strategy may have been "adjusted" if they had known that a juror or jurors had wanted to know whether it was possible for another DNA expert to look at the same reports and have a different opinion. As the State points out, appellants do not claim in their briefs that they would have called their own DNA expert to rebut Mr. Chiafari's testimony. Moreover, it is significant that both defense counsel focused their cross-examination on the same question as asked in note 27. Under such circumstances, it is once again impossible for us to envision how defense counsel's trial strategy may have differed if they had known the source of the question was a note from the jury.

For the above reasons, we hold that, although Judge Mitchell erred in failing to reveal the contents of the six jury notes to counsel, the error did not affect the jury's guilty verdict.

## III.

### Second Joint Issue

As mentioned earlier, one of the State's main witnesses was Francis Chiafari, who was the Director of Molecular Technology for a company that provides genetic testing services. The court qualified Mr. Chiafari as an expert in the forensic analysis of DNA as well as an expert in the relationship analysis of DNA.

Perez argues that Judge Mitchell committed reversible error by allowing Mr. Chiafari "to express an opinion endorsing the State's theory of the ability of ... Bianca's forensic vacuum device to draw biologic[al] material through the fabric of gloves and blue jeans." Canela makes an almost identical argument, asserting that the trial judge erred by allowing Mr. Chiafari to provide an expert opinion as to "the scientific validity of a forensic material collection device used by another witness in the case." Both appellants argue that Mr. Chiaf-

ari's opinion as to the Bianca forensic vacuum should have been excluded because that opinion had not been disclosed by the Prosecutor in pre-trial discovery and, in any event, Mr. Chiafari had not been qualified as an expert in that area.

On direct examination, Mr. Chiafari and the Prosecutor had the following un-objected to exchange:

Q ... Mr. Chiafari, do you know Salvatore J. Bianca?

A I do.

Q How long have you known him?

A Since 1993. So thirteen years.

Q Have you ever worked with him?

A I have.

Q Have you ever observed his work?

A I have.

Q Have you—how frequently have you worked with him?

A Well, we worked on a number of projects at the Baltimore Police Department when I was technical leader of the DNA lab there. And, I've also worked on a few cases at BRT [the place where Mr. Chiafari was employed] with him acting as a consultant.

Q And, did any of the work that you ever observed or work with him on involve his use of a small vacuum collector device that involved a glass test tube with a cotton swab inserted in it as the collection device?

A Well, it was actually a glass Pasteur pipette.

Q I'm sorry. I stand corrected.

A Yes. But I have worked with that device, such as it is with him and also independently.

Q How many times with him?

A Well certainly I've tested a lot of samples that he generated. I guess I've worked directly with him maybe five or six times, directly.

Q And you said you've also used it yourself. What do you mean?

A Well, we've had a case or two where we have used it for the same purpose. That is to collect a portion of cells or biological material on the surface of an item and concentrate it for DNA testing.

Q Would you use any apparatus if you considered it not scientifically valid?

A No, I would not.

The prosecutor then asked Mr. Chiafari "what, if any, opinion do you have of the collection device ... [we are] discussing?" Both counsel objected and a bench conference ensued. Counsel for Perez objected to the question because Mr. Chiafari had not used the Bianca device, nor had he even seen it until after the device was used in the subject case. Perez's counsel framed his argument as follows:

> The only tests that we've really questioned about the vacuum had to do with Salvator Bianca's use of the machine back in 2004. If this witness is testifying to his knowledge of the machine and used it at the time that Mr. Bianca used it to test, fine. But, if this witness is testifying as to his learning of the machine and the use of the machine after the middle of 2004, it's irrelevant to this case.

At the bench conference, Canela's counsel stated his objection in these words:

> I would like to add on behalf of Mr. Canela, that now, again, another time that this expert, not a lay person (inaudible), is being asked to give an opinion as to the—I don't know—*the workability, if you will, of another's expert machine.* It's an expert being asked to give an opinion. And from a Jury standpoint, he [was] giving his expert opinion as to whether the machine that was designed by Salvator Bianca works properly, functions properly, and then given the Jury the impression that—well, an expert said that the machine that Mr. Bianca built (inaudible).
>
> (Inaudible) either bring in Mr. Bianca in to testify about his device; or Terry Labbie, who can testify about this device; or Mr. Exline who had an opportunity to (inaudible).

(Inaudible) can just testify to whatever (inaudible) it wants (inaudible).

The trial judge overruled the objections and, immediately thereafter, the prosecutor and Mr. Chiafari engaged in the following colloquy, to which defense counsel did not object:

Q Mr. Chiafari, the question is, do you have an opinion to a reasonable degree of scientific certainty whether the collection device made by Mr. Bianca, not you, of a Pasteur pipette, with a sterile swab in it, is a scientifically valid collection device? Yes or no.

A Yes.

Q Why?

A Because it was first described about fifty years ago in the literature, and has been used at various times, in various iterations by other groups. And, although he has used some different components than what was originally described, certainly its consistent with all of those applications.

And the general concept is a valid one. That is to collect biological material in a small space, that can be easily extracted and ultimately tested for DNA.

Maryland Rule 4–323(a) provides: "An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." The part of Rule 4–323(a) that we have just quoted is known as the "contemporaneous objection rule." Appellants' counsel did not object when the prosecutor asked Mr. Chiafari if he had an opinion to a reasonable degree of scientific certainty whether Mr. Bianca's device was scientifically valid, nor was an objection made when the witness was asked to explain his answer. Thus, technically, defense counsel did not comply with the contemporaneous objection rule. But, counsel did object immediately before the question was asked and therefore, insofar as the grounds for the objection mentioned immediately before the question was asked are concerned, appellants did not waive their objection because a

reiteration of those grounds would have been futile. *See Dyce v. State,* 85 Md.App. 193, 198, 582 A.2d 582 (1990). The difficulty for appellants, however, is that neither counsel said at the bench conference, immediately before the offending questions were asked, that Mr. Chiafari's testimony should be excluded because of a discovery violation. If a party volunteers grounds for an objection, that party ordinarily will be deemed to have waived any ground not stated. *Washington v. State,* 191 Md.App. 48, 91, 990 A.2d 549 (2010) (citing *Leuschner v. State,* 41 Md.App. 423, 436, 397 A.2d 622 (1979)). Because defense counsel did not allege a discovery violation immediately prior to the question and answer to which appellants now take exception, that issue has been waived.

In his brief, Perez claims that the challenged opinion was improper because it was "outside the scope of [Mr. Chiafari's] expertise" inasmuch as he was qualified as an expert in "forensic and relationship DNA analysis" but not qualified or accepted as an expert in the field of "forensic sample ... collection...." Canela's argument is similar. He asserts that Mr. Chiafari's expert testimony concerning the validity of a forensic material collection device "was outside Chiafari's area of expertise." Neither argument by counsel for appellants was made at the bench conference immediately preceding the testimony about which appellants now complain. Thus, the issue of whether Mr. Chiafari was qualified in the area of forensic collection was not preserved. *See Harmony v. State,* 88 Md.App. 306, 317, 594 A.2d 1182 (1991) ("A party must bring his arguments to the attention of the trial court with enough particularity that the court is aware first, that there is an issue before it, and secondly, what the parameters of the issues are.").

## IV.

### Third Joint Issue—The Court's Failure to Suppress Appellants' Incriminating Statements

Both appellants claim that the statements they gave to the police after they were transported to the homicide unit

should have been suppressed. According to the appellants, the police arrested them, without probable cause, prior to the point that they made their statements. Appellants maintain that, because they were illegally arrested, the statements, as the fruits of an illegal arrest, should not have been admitted. The State asserts, and the suppression court agreed, that when the appellants gave their statements to the police they were not under arrest.

 In a case such as this, where we are asked to review the denial of a motion to suppress evidence, we look only to the evidence that was presented at the suppression hearing. *Belote v. State,* 411 Md. 104, 120, 981 A.2d 1247 (2009). Moreover, we review "the evidence in the light most favorable to the prevailing party and defer[ ] to the motions court with respect to its first level factual findings." *Id.* (citations omitted). "The ultimate determination of whether there was a constitutional violation, however, is an independent determination that is made by the appellate court alone, applying the law to the facts found in each particular case." *Id.* (citations omitted).

At the three-day suppression hearing held in these consolidated cases, the appellants elected not to testify. The motions judge made the following factual findings, based on the testimony of several police officers:

♦ The decision made by the police department to take family members away from the "chaotic environment of the [crime] scene ... and continue the investigation in the relative quiet and security" of the police station was an "appropriate" decision made "for the safety of the public, ... the officers and the ... witnesses."

♦ The appellants were the first to arrive at police headquarters and their entry, like that of the other witnesses, was permitted only after passing through security.

♦ The appellants were not restricted physically in any way after being placed in holding cells; no handcuffs or

other physical restraints were placed upon them, nor were their movements restricted by leg irons.

♦ Although the appellants could not go to the bathroom or "roam the facilities without an escort," that restriction was reasonable given that the homicide division of the police department "is a controlled and restricted" area in which no one can doubt that "dangers lurk" because those in the facility are "investigating the crime of murder" at a homicide office where there is a mix of "suspects, witnesses, police and emotion."

♦ Members of the family of the deceased were placed "in different locations within the homicide division offices once they arrived at those facilities" with the intent of the police officers to interview them, as well as appellants.

♦ The interviews of the appellants and other family members were delayed because the assistance of an interpreter was needed inasmuch as most of the investigating officers only spoke English while family members needed the assistance of an interpreter. *Miranda* warnings were given to the appellants in the Spanish language, which was their native tongue.

♦ While appellants were interviewed, the police officers were unarmed.

♦ While at homicide headquarters, appellants were not subjected to any threats nor were inappropriate statements made by the police officers who came in contact with them. Moreover, no promises or inducements were made to them by the officers.

♦ The police used no "trickery, subterfuge or other inappropriate" tactics in order to obtain the statements from the appellants.

♦ The decision by the appellants to speak to the police officers was made voluntarily.

♦ During the period that appellants were at police headquarters "there was no[ ] restraint of liberty or conduct tantamount to an arrest" until after appellants made their statements.

♦ Taking into account the "totality of the circumstances," the appellants were not arrested prior to the time that they gave their statements to the police.

In this appeal, Perez contends that the "motions court did not apply the correct legal standard" in deciding whether he was under arrest. According to Perez, the issue to be decided should have been "whether a reasonable person in [Perez's] position would have felt free to leave." The test Perez espouses is incorrect. He confuses the test to be used when determining whether a "seizure" has occurred within the meaning of the Fourth Amendment to the United States Constitution ("i.e., whether a reasonable person in [the defendants'] position would have felt free to leave") with a very different test that is to be applied when the issue is whether an arrest has been made. *Compare Swift v. State*, 393 Md. 139, 150, 899 A.2d 867 (2006), which deals with the test as to whether a "seizure has occurred," *with Belote v. State*, 411 Md. at 116, 981 A.2d 1247, setting forth the test to be utilized when determining whether a person has been arrested.[3]

In *Belote, supra*, the Court of Appeals quoted *Bouldin v. State*, 276 Md. 511, 516, 350 A.2d 130 (1976), as follows:

[W]e explained [in *Bouldin* ] that an arrest in Maryland ordinarily requires four elements to coalesce: "(1) an intent to arrest; (2) under a real or pretended authority; (3) accompanied by a seizure or detention of the person; and (4) which is understood by the person arrested."

*See also Longshore v. State*, 399 Md. 486, 502, 924 A.2d 1129 (2007).[4]

---

**3.** While all persons who are arrested have also been "seized," not all persons who have been "seized" by the police have been arrested. For example, if the police make a traffic stop, a passenger in the stopped car has been seized at the moment that the car is pulled over. *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). But, quite obviously, the passenger has not been "arrested" at that point.

**4.** Unlike Perez, Cancla does not specifically set forth what test he contends should be applied in determining whether he was under arrest at any point prior to making his statement to the police.

With the appropriate test in mind, we turn to the facts concerning what happened to the appellants and other members of the victims' family at the police station.

All told, fifteen family members either drove themselves or were transported to homicide headquarters on the afternoon of the murders. According to the police officers who testified at the suppression hearing, only one of the family members was initially treated as a homicide suspect. That person was Maurici Maurieta. Maurieta was handcuffed and shackled and forcibly taken to police headquarters. In contrast, the appellants were not handcuffed, nor were they shackled until after Perez gave his statement to the police. While appellants were held in a holding cell, the doors to the holding cell were not locked—or even closed.

Canela was transported to police headquarters in a squad car. Detective Casteneda sat beside Canela while another officer drove. The front passenger seat was empty. The car door to the police cruiser could be opened from the inside backseat and during the trip to police headquarters Canela was not handcuffed or otherwise restrained.

Perez was driven to the police station by Kenneth Jackson, a Baltimore police officer. Jackson drove a marked police cruiser, but one that did not have a "cage." Officer Jackson was accompanied by another police officer. According to Officer Jackson, although he might have touched Perez when he was entering the car, no force whatsoever was used and he was not patted down for weapons prior to being transported. Officer Jackson testified that Perez entered the vehicle voluntarily and, once inside, was not restrained in any way; Perez was "very cooperative."

All family members, including the appellants, were escorted into the homicide office by uniformed personnel. The homicide office in which the family members were brought has work areas for some forty-eight detectives; it contained holding areas and interview rooms.

When Perez was initially interviewed by Detective Bradley at the apartment complex, Bradley informed Perez about

inconsistencies between his statement and that of Canela.[5] But, according to Detective Bradley, nothing was done "to label . . . [either appellant] as being persons or people responsible for this incident."

Other family members were placed in various cubicles or offices throughout the homicide office. According to Detective Massey, this was standard protocol when multiple witnesses were to be interviewed. The various officers who transported family members to police headquarters remained at headquarters because they were needed to escort the large number of persons present to the restroom and snack areas as needed. Detective Massey, who interviewed both appellants, testified that he did not consider either Perez or Canela to be in custody and that he advised them of their *Miranda* rights only because he wanted "to err on the side of caution."

According to the uncontradicted testimony of the detectives who interviewed the appellants, the appellants were considered to be under arrest only after Perez gave his statement in which he said, *inter alia*, that he and Canela went to the apartment at about 4:20 p.m. and that Canela, after staying inside the apartment for about twenty minutes, then exited through a window, without his shirt.

Our decision in *Sydnor v. State*, 39 Md.App. 459, 387 A.2d 297 (1978), is instructive. In *Sydnor*, two Prince George's County Police Officers, after collecting evidence indicating that Sydnor had been at the scene of a murder, drove to Sydnor's father's residence in St. Mary's County. *Id.* at 461, 387 A.2d 297. The officers told Sydnor that they wanted to speak with him concerning the death of Kathleen Sebastian. They also said that they wanted Sydnor to accompany them to Prince George's County Police Station. *Id.* Sydnor agreed, and after unloading packages from his car and bringing them into his father's house, Sydnor got into the backseat of the

5. The "inconsistency" referred to was that Canela had said when interviewed at the crime scene that he was at home with Perez all day; in contrast, Perez said, initially, that he was at work on the day in question.

unmarked police vehicle and was transported to the station house. *Id.*

At the police station, officers advised Sydnor of his *Miranda* rights, had him sign a waiver of rights form, and began interviewing him. *Id.* Sydnor told police that he had intercourse with Sebastian and afterwards ran her over with his car. *Id.*

Sydnor made a motion to suppress his statement, which the trial court denied. *Id.* On appeal, Sydnor argued that when the police officers took him from his father's house he was illegally arrested. His counsel argued that the Prince George's County Police Officers did not have authority to arrest Sydnor in St. Mary's County. *Id.* Based on this premise, Sydnor maintained that his confession was the fruit of an illegal arrest and should therefore have been suppressed by the court. *Id.* at 461–62, 387 A.2d 297.

In *Sydnor*, we first noted that the evidence demonstrated that the Prince George's County Police Officers had no intention of arresting Sydnor when they arrived at his father's house and that the police were simply continuing their investigation at police headquarters. *Id.* at 463, 387 A.2d 297. We found it significant that, after police officers requested Sydnor to accompany them to the police station, he continued to unpack packages from the car, because if the officers "intended to arrest appellant at this time, we think it unlikely that they would have let him enjoy such freedom of movement." *Id.* We also attributed weight to the fact that the police did not physically restrain Sydnor. *Id.* at 464, 387 A.2d 297. We held that "the gratuitous and unnecessary giving of Miranda warnings ... [does not] operate to convert an otherwise noncustodial situation into a custodial one." *Id.* at 463–64, 387 A.2d 297 (quoting *Cummings v. State*, 27 Md.App. 361, 376, 341 A.2d 294 (1975)). The *Sydnor* Court concluded that "the trial judge was not clearly erroneous in his implicit determination at the suppression hearing that an arrest had not been effectuated at the house of appellant's father since appellant

willingly returned with the police officers to Prince George's County." *Id.* at 464, 387 A.2d 297.

As mentioned earlier, the *Belote* Court stressed that ordinarily, in order for there to be an arrest, four elements must coalesce, the first of which is "an intent to arrest" on the part of the police officers. 411 Md. at 116, 981 A.2d 1247. Taking the evidence in the light most favorable to the State, there was no intent to arrest either of the appellants at any point until after Perez made his final statement to the police. That was the testimony of the police officers involved, and it was corroborated by the fact that the appellants both were kept in a holding cell with the door open under no constraints, and that while being transported to police headquarters they were not handcuffed.

As in the *Sydnor* case, it is unlikely that the police would allow a person to enjoy such freedom if the police considered that person to be under arrest. It is true, as appellants stress, that when the appellants entered the police station and when they went to the interview rooms or to the bathroom they were accompanied by uniformed officers. But, as the motions judge observed, the presence of uniform escorts was but a prudent measure in a homicide unit and in no way indicated that the persons being interviewed were under arrest.

We recognize that the subjective intent of the police officers who are in contact with a suspect is not necessarily conclusive as to whether an arrest has been made. *See Belote,* 411 Md. at 117, 981 A.2d 1247. As the *Belote* Court said:

[W]hen an arresting officer's objective conduct, which provides significant insight into that officer's subjective intent, is unambiguous, courts need not allocate significant weight to an officer's subjective intent that is revealed partially in the form of his testimony at the suppression hearing; the officer's objective conduct, in effect will have made his subjective intent clear. It is only when an arresting officer's objective conduct is ambiguous that his or her subjec-

tive intent increases in importance to a court's legal inquiry into whether a custodial arrest of the subject occurred.

Here, the conduct of the officers who came in contact with the appellants was not ambiguous. By allowing the appellants to ride in a police car unrestrained and to enter the police station and the holding cells, again while unrestrained, and allowing them to wait at police headquarters in a room with the door open, it is clear by the objective conduct of the police officers that they did not intend to arrest appellants prior to Perez's statement.

We therefore hold that the motions judge did not err in concluding that the appellants were not arrested at any time here relevant.

## V.

### Fourth Joint Issue—Hearsay Evidence

As mentioned *supra*, the mother of two of the victims (Ricardo Jr. and Lucero) was referred to in the trial testimony as "Mimi." Mimi is the aunt of Maria, the mother of the third victim, Alexis. Both Mimi and Maria testified as prosecution witnesses.

During cross-examination by Perez's counsel, Mimi was asked about "threats" or "concerns or suspicions about [her] niece's husband." The questioner was referring to Maria's estranged husband, Jose Luis Solis, who was the father of Maria's daughter, Monserret. Monserret was about 2 years old when her brother, Alexis, was murdered. In response, Mimi said that she would "say it to the judge but" did not "want to say it out in public." A bench conference was then held.

At the bench conference, Mimi told Judge Mitchell that although she had never met Solis she suspected him of killing her children because he had threatened Maria. At the bench conference, Mimi said that she learned of the threat during a telephone conversation with Maria when Maria called her from Mexico. Maria was said to have told Mimi that Solis was

"a very bad person." According to Mimi, Maria also told her, when Maria phoned her from Mexico, that Solis said to her (Maria), "you're going to remember me and you're going to cry tears of blood as we have shed them."

Counsel for both appellants argued at the bench that these threats should be heard by the jury to impeach the testimony of Maria. Alternatively, appellants argued, citing *Foster v. State*, 297 Md. 191, 464 A.2d 986 (1983), that even though the statement constituted hearsay, they should nevertheless be admissible because the exclusion of this type of exculpatory hearsay would deprive them of a fair trial.

The State objected to the "tears of blood" statement on hearsay grounds. The prosecutor also argued that Mimi's testimony as to this point was unreliable because she (Mimi) had told the police that she had heard about the "tears of blood" threat not from Maria but from one of her children's school teachers.

Judge Mitchell ruled that the "tears of blood" comment did not impeach Maria's testimony but was merely an extension of it. He nevertheless ruled as follows:

> I will permit you to cross-examine the witness regarding a threat to Maria issued by [Maria's] husband and you may ask the witness when, where, and how the conversations occurred. I will not permit you to go into the details of the conversations or the words because I believe it is barred by hearsay.

Judge Mitchell added that he would also allow defense counsel to ask Mimi whether she interpreted the comment as a verbal or physical threat.

Mimi told the jury on cross-examination that she was suspicious about Solis because Maria had told her about a threat during a phone call that Maria made from Mexico. When asked whether she (Mimi) viewed it as a physical or verbal threat, Mimi answered that she believed "that it was a strong threat."

In this appeal, both appellants contend that the "tears of blood" testimony should have been allowed because, *inter alia*, it contradicted Maria's testimony.

To understand whether the "tears of blood" statement contradicted Maria's testimony it is necessary to summarize relevant parts of it.

Maria testified that she emigrated to the United States from Mexico in December of 2003, which would have been approximately 5 months before her son, Alexis, was murdered. She brought with her Alexis and her daughter, Monserret, who was one year and nine months old when she immigrated. She left behind her husband, Jose Solis, who was a lawyer. While in Mexico, Maria and Solis, although married, never lived together.

Maria was asked by the prosecutor about whether, shortly before the murders, anyone had made threats to either her or her family. She responded that, while she was still living in Mexico, Jose Solis "wanted [her] to go back with him and he said that [she] would regret ... it if I didn't go back with him." [6]

Counsel for both appellants cross-examined Maria on this subject. Perez's counsel and Maria's had this exchange:

Q. December, okay. And you stated you came [to the United States] with Alexis and Monserret, your two children?

A. Yes.

Q. Had anybody in Mexico either while you were still in Mexico or after you came to the United States threatened you with bodily harm.

A. No.

Q. No. Did you ever receive threats from Jose Luis Solis?

A. Jose Luis Solis shortly after my daughter was born, he wanted us to—for us to get back together and he said that I would regret it if we didn't go back together.

---

6. Solis was the father of Monserret but not Alexis.

Q. What did you take—

A. This was just after I had started working.

Q. Were you already in the United States at this point?

A. No.

Q. What did you take it to mean that you would regret it?

Prosecutor: Objection.

THE COURT: Overruled. You may say what your impression was.

A. Because he said—well, because he was going to take my dog.

Canela's counsel and Maria engaged in the following colloquy:

Q. And when you—you referred to Jose Luis Solis as threatening you to return to Mexico?

A. No, I never said that.

Q. Threatening you to get back with him?

A. When I was in Mexico. When I had my daughter days later it was a (inaudible) and then we had something of an argument that he wanted me to go back with him.

Q. How long after that did you come to the United States?

A. Well, my daughter was a year and nine months old.

Q. Did you have—were you even made aware of any fears that your children had of Jose Luis Solis?

A. Would you repeat the question?

Q. Were you ever aware of whether your children had any fears of Jose Luis Solis?

A. No.

Q. After you came to the United States did you ever hear from Jose Solis again?

A. Never.

As mentioned, the trial judge ruled that what Mimi said Maria told her about Solis's threat was hearsay. This was correct because the appellants were seeking to introduce the statement by the out-of-court declarant (Maria) to prove that

Solis made the "tears of blood" statement. *See* Md. Rules 5–801, 5–802. In this appeal, appellants do not dispute the fact that the proffered "tears of blood" statement was hearsay.

### A. Prior Inconsistent Statement

Citing Md. Rule 5–613(b) and Rule 5–616(a)(1) and (b)(1), Canela argues that the statement at issue was admissible as a prior inconsistent statement.

Md. Rule 5–613 reads:

(a) **Examining witness concerning prior statement.** A party examining a witness about a prior written or oral statement made by the witness need not show it to the witness or disclose its contents at that time, provided that before the end of the examination (1) the statement, if written, is disclosed to the witness and the parties, or if the statement is oral, the contents of the statement and the circumstances under which it was made, including the persons to whom it was made, are disclosed to the witness and (2) the witness is given an opportunity to explain or deny it.

(b) **Extrinsic evidence of prior inconsistent statement of witness.** Unless the interests of justice otherwise require, extrinsic evidence of a prior inconsistent statement by a witness is not admissible under this Rule (1) until the requirements of section (a) have been met and the witness has failed to admit having made the statement and (2) unless the statement concerns a non-collateral matter.

Md. Rule 5–616(a)(1) and (b)(1) provide:

(a) **Impeachment by inquiry of the witness.** The credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at:

(1) Proving under Rule 5–613 that the witness has made statements that are inconsistent with the witness's present testimony. . . .

(b) **Extrinsic impeaching evidence.** (1) Extrinsic evidence of prior inconsistent statements may be admitted as provided in Rule 5–613(b).

Nothing in Md. Rule 5–613(a) is of aid to the appellants. By its plain terms, Rule 5–613(a) would be applicable only if Maria was on the stand and counsel was attempting to *impeach her* about a contradictory prior statement.

 When counsel asked Judge Mitchell to allow them to ask Mimi about the "tears of blood" statement, they were proffering extrinsic evidence of an (allegedly) inconsistent statement by Maria. Thus, Md. Rule 5–613(b) was applicable. But to meet the requirements of section (b) of Rule 5–613, besides showing that the statement involved a "non collateral matter," appellants were required to show that the requirements of section (a) of Rule 5–613 had been met "[u]nless the interest of justice otherwise require[d]." Appellants did not meet the requirements of section (a) of Rule 5–613, because when Maria was on the stand the content of the "tears of blood" statement was not disclosed to her, nor was she given a chance to deny having heard the statement or to explain it. Canela impliedly recognizes that the requirements of section (a) were not met, but argues:

> Since the record shows that the full details of this chilling threat were revealed to defense counsel only after Maria had departed from the witness stand, the "interests of justice" modifier in Maryland Rule 5–613(b) was available to the trial court and is available to this Court, as well.

It is true that defense counsel did not know about the "tears of blood" statement when Maria testified. But in the trial court the appellants never contended that the interest of justice exception applied. More important, appellants never asked the court for permission to recall Maria.[7]

---

7. Technically, it is true that Maria had "left the stand" prior to the point that appellants learned of the "tears of blood" statement. But she evidently had not left the courthouse because, immediately after Maria testified, she was granted permission to stay in the courtroom; thus, she apparently was easily available as a witness for the defense. And, although there was a rule on witnesses, appellants' counsel could have asked the court to allow them to call Maria as a witness in order to comply with Rule 5–613(a). They did not do so.

■ As mentioned, Canela also relies on Md. Rule 5–616(a)(1). That section of the rule is plainly inapplicable to the proffered testimony of Mimi. That section deals with the permissible scope of questions asked of a witness whom the questioner is attempting to impeach. Here, appellants were not attempting to impeach Mimi. They were attempting to impeach Maria, a prior witness.

Rule 5–616(b)(1), contrary to Canela's argument, is also inapplicable because, as already discussed, the requirements of Rule 5–613(b) were not met.

■ Perez also contends that the "tears of blood" statement was admissible because it (purportedly) contradicted Maria's testimony. But Perez cites no statute, court rule or case law that would allow such testimony. Thus, Perez's argument is waived due to his failure to cite authority in support of it. *See Benway v. Md. Port Auth.,* 191 Md.App. 22, 32, 989 A.2d 1239 (2010) (and cases therein cited).[8]

Both appellants claim, in the alternative, that the "tears of blood" testimony of Maria should have been admitted pursuant to the hearsay exception recognized in *Foster v. State,* 297 Md. 191, 464 A.2d 986 (1983). Doris Foster was on trial for felony murder. *Id.* at 193, 464 A.2d 986. Her defense was that her husband and daughter had committed the murder. *Id.* at 195, 464 A.2d 986. Foster's husband was asked on cross-examination if he had threatened the victim; he denied

---

**8.** The State argues that the "tears of blood" statement was not inconsistent with Maria's testimony. It asserts that, to qualify as an inconsistent statement,

> the inconsistency must directly contradict trial testimony, be implied from the witness's failure to testify about a matter entirely when under the circumstances he or she reasonably would be expected to do so, or reflect a lapse of memory that amounts to deliberate evasion. *Nance v. State,* 331 Md. 549, 564 n. 5 [629 A.2d 633] (1993); *Corbett v. State,* 130 Md.App. 408, 425 [746 A.2d 954], *cert. denied,* 359 Md. 31 [753 A.2d 3] (2000). The trial court correctly concluded that the alleged "tears of blood" language merely expanded on Maria's testimony about the threat. The phrase was not a prior inconsistent statement.

Although the foregoing argument appears to have considerable merit, we need not decide that issue.

having done so. *Id.* at 200, 464 A.2d 986. Foster then called a rebuttal witness, Helen Douglass, a friend of the victim. *Id.* Foster's counsel proffered, out of the presence of the jury, that the witness's testimony was being introduced for the purpose of impeaching the husband's testimony that he had not threatened the victim. *Id.* In the judge's chambers, Ms. Douglass told the court that the victim told her that Foster's husband "had threatened to kill her [the victim]." *Id.* at 201, 464 A.2d 986. The trial court found the testimony was hearsay and disallowed it. *Id.*

On appeal, the Court phrased the issue to be decided as follows:

> In this case, we are concerned with the admissibility of testimony by a friend of the victim to the effect that the victim had told her that the husband of the accused had threatened to kill the victim. Thus, we are presented with the compound question of the admissibility of each of two extrajudicial statements—one by the accused's husband made to the victim, and the other by the victim made to her friend.

*Id.* at 209, 464 A.2d 986.

The *Foster* Court applied the rule enunciated in *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), that "rules of evidence could not be applied if, under the facts and circumstances of the particular case, their application deprived the accused of a fair trial." 297 Md. at 207, 464 A.2d 986. The Court held that Foster had adduced some evidence showing that her husband killed the victim, but was unable to present the proffered testimony, which "was a critical additional piece of evidence tending to show that the husband had killed the victim." *Id.* at 211, 464 A.2d 986 (footnote omitted).

The Court continued:

> [S]ufficient indicia of reliability were present to assure the proffered testimony's trustworthiness. The husband's threat was made spontaneously during an argument with

the victim over the payment of rent, and was a statement against interest. The victim's extrajudicial statement was made spontaneously at a time when she was excited, and under circumstances in which she had no reason to lie. Additionally, her extrajudicial statement was made shortly before the murder to a close acquaintance with whom she had previously exchanged information about tenants. *Both the accused's husband's threat and the victim's extrajudicial statement were corroborated by other evidence*—the accused's husband's two written confessions, the accused's testimony that her husband was present at the time of the commission of the crime, and the accused's husband's testimony that he cleaned up the room in which the murder took place, removed and disposed of the body, and shared in the proceeds of the robbery. *Finally, if there was any question about the reliability of either the husband's or the victim's extrajudicial statements, the accused's husband was present in the courtroom, under oath, and was available for cross-examination by the State before the jury. Thus, the testimony rejected by the trial court bore persuasive assurances of trustworthiness.*

Under the circumstances here, the accused's constitutional right to call a witness in her own behalf, a right that directly affected the ascertainment of her guilt, was implicated. *We conclude that the hearsay rule excluded evidence that was critical to the defense and that bore persuasive assurances of trustworthiness.* As a result of this exclusion, the accused's defense was far less persuasive than it might have been had the husband's threat been admitted. Under the facts and circumstances of this case, the exclusion of exculpatory hearsay evidence deprived the accused of a fair trial and, therefore, of due process of law.

*Id.* at 211–12, 464 A.2d 986 (emphasis added).

In *Powell v. State,* 324 Md. 441, 597 A.2d 479 (1991), the Court affirmed a trial court's ruling that a witness could not testify that one Uggy Wright told him that he had knowledge of the crime. *Id.* at 453, 597 A.2d 479. The Court opined that

the hearsay statement did not fit into the rule enunciated in *Foster*, saying:

> [There] is no corroboration that Uggy Wright participated in the crime or was at or near the scene, at or about the time the murder occurred. Furthermore, the trial court specifically determined that the statements were not trustworthy. That factual issue is, in the first instance, properly entrusted to the trial court. *See Brady v. State*, 226 Md. 422, 429, 174 A.2d 167, 171 (1963). We perceive no error in that regard. Finally, Uggy Wright was not available to testify under oath, the reasons for which petitioner did not explain. Therefore, under the circumstances of this case, "the hearsay testimony proffered in this case [being] neither 'critical' nor particularly 'reliable,' " *Powell* [ *v. State*, 85 Md.App. 330, 343, 583 A.2d 1114 (1991) ], was properly excluded.

*Id.*

 In the case *sub judice*, Mimi's statement had no indicia of reliability if, as appellants contend, it was intended to prove that Solis threatened to kill the children. To begin with, he never threatened to kill the children. The vague threat he did make was made (according to Mimi), at the earliest, when Maria was in Mexico, which was five months before the children were killed. More important, unlike any case utilizing the exception discussed in *Foster*, here there was no evidence that the person that the defendant(s) wanted to implicate actually committed the crimes. In fact, there was no evidence that Solis, a Mexican lawyer, was even in the United States when the children were killed.[9]

---

9. As the *Foster* Court mentioned, the hearsay exception at issue was first recognized in the famous case of *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

In *Montana v. Egelhoff*, 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996), a plurality of the Supreme Court said:

> *Chambers* was an exercise in highly case-specific error correction. At issue were two rulings by the state trial court at Chambers' murder trial: denial of Chambers' motion to treat as an adverse witness one McDonald, who had confessed to the murder for which Chambers

Appellants both argue that the "tears of blood" testimony was "central to the defense." We disagree. Mimi was still able to testify that Maria's husband made a "strong threat" to Maria, which left the possibility that Maria's husband may have had motive to commit the murders. Unlike the situation presented in *Foster*, where the threat was that the husband said to the victim that he was "going to kill her," here, the threat was made long before the murders and was, to say the least, non-specific.

For the above reasons, we hold that the trial court did not abuse its discretion in finding that the statement purportedly made by Solis did not fall within the exception to the hearsay rule recognized by *Foster*. *See Parker v. State*, 408 Md. 428, 436, 970 A.2d 320 (2009) ("We review rulings on the admissibil-

---

was on trial, but later retracted the confession; and exclusion, on hearsay grounds, of testimony of three witnesses who would testify that McDonald had confessed to them. We held that both of these rulings were erroneous, the former because McDonald's testimony simply *was* adverse, [410 U.S.] at 297–298 [93 S.Ct. 1038], and the second because the statements "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability," *id.*, at 300 [93 S.Ct. 1038], and were "well within the basic rationale of the exception for declarations against interest," *id.*, at 302 [93 S.Ct. 1038]. Thus, the holding of *Chambers*—if one can be discerned from such a fact-intensive case— is certainly not that a defendant is denied "a fair opportunity to defend against the State's accusations" whenever "critical evidence" favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation.

*Id.* at 52–53, 116 S.Ct. 2013.

Two years after the *Egelhoff* decision, a majority of the Supreme Court stressed the narrow scope of the holding in *Chambers* as follows: *Chambers* specifically confined its holding to the "facts and circumstances" presented in that case; we thus stressed that the rulings did not "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." *Chambers* therefore does not stand for the proposition that the accused is denied a fair opportunity to defend himself whenever a state or federal rule excludes favorable evidence.

*United States v. Scheffer*, 523 U.S. 303, 316, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (internal citations omitted).

ity of evidence ordinarily on an abuse of discretion standard.")
(citation omitted).

## VI.

### Issue Raised By Canela Only

■ In regard to Mr. Chiafari's testimony, Canela argues
that Judge Mitchell erred in allowing Mr. Chiafari to voice an
opinion as to "the effect of porous glove material on the
intermingling of blood cells," due to either Mr. Chiafari's
(alleged) lack of expertise or due to the State's discovery
violations. One problem with this argument is that Canela
does not specify what question asked of Mr. Chiafari he
contends was improper. Instead, Canela refers us to pages
13–27 of the July 27, 2006 transcript. Our review of pages 13–
27 reveals that, in those 14 pages, only one question was asked
of Mr. Chiafari that was allowed to be answered over Canela's
counsel's objection. We therefore presume that the question
and answer at issue took place during the following exchange:

Q And, if the person who is putting the glove on his hand,
leaves skin cells on the fabric, and while his hand is in the
glove, blood comes in contact with the fabric . . .

[Canela's counsel] Objection.

[Prosecutor] I haven't finished the question.

THE COURT: Finish the question, please.

[BY PROSECUTOR]

Q . . . what, if anything, would happen to the skin cells in
relation to the blood that would come in contact with it, if
it did, on the glove?

[Perez's Counsel] Objection

THE COURT: Overruled.

A Okay. What we would have would be a mixture. We
would have a mixture of cells from the contact originally
deposited as the glove was placed on, and then the blood
depositing cells that had DNA in them as well.

And so, when DNA was isolated from the item, you would
get a DNA mixture.

In other words, Canela contends that Judge Mitchell committed reversible error when he allowed Mr. Chiafari to say that if a person put on gloves and left skin cells on the fabric of the glove, the skin cells of the glove-wearer would be a part of a mixture of the cells from the glove-wearer and the cells in the blood that came in contact with the fabric of the glove.

Prior to giving that objected-to answer, the prosecutor and Mr. Chiafari had the following exchange, which was not interrupted by objections:

Q I would ask you to look at these gloves. Have you ever seen fabric such as this in your experience as a trace analyst?

A I have seen fabric such as this before.

Q And what, if any, impact is there on the weave of the fabric with regard to your ability to recover trace evidence from it?

A Well, we, as organisms, shed cells all the time. Which means that everything that we come into contact with has our biological material on it. That's because we're a constantly living organism that's constantly replacing our cells and so on. It's the reason that we have to eat and breathe and all the rest.

Certain individuals will sloth [sic] off more cells than others, and so they're more likely to leave a sample on some casual contact item than someone else is. But the texture and the material involved in the item also determines the number of cells that are left. And so, essentially, when we wear a garment or some other item, we can frequently deposit biological material on it without having to bleed or shed any other biological fluids.

Q And, is it within your expertise ... And this is just a yes or no. To tell us whether a person who would touch a glove such as this one, for the purpose of putting it on his hand, would or would not leave skin cells on this glove in the process of handling it, given the fabric?

A He could certainly leave skin cells on the glove in the process of handling the fabric.

Later in his testimony, Mr. Chiafari was asked by the prosecutor: "how could blood that hadn't bled through the item, end up being vacuumed on the inside of a cotton woven item, if you know?" Canela's counsel did not object to that question, and Mr. Chiafari answered, "the cells get sucked through the fiber. Besides the fact that the stain may soak into the fiber itself. So there are a few scenarios that you could invoke to explain it."

We turn now to Canela's contention that the trial judge erred in allowing Mr. Chiafari's expert testimony regarding how a bloodstain may contain a mixture of DNA from the victim and the person wearing the glove. Maryland Rule 4–263(b)(4) (2006), which was in effect when this case was tried for the second time, provides:

> (b) **Disclosure upon request.** Upon request of the defendant, the State's Attorney shall:

> \* \* \*

> (4) *Reports or statements of experts.* Produce and permit the defendant to inspect and copy all written reports or statements made in connection with the action by each expert consulted by the State, including the results of any physical or mental examination, scientific test, experiment, or comparison, and furnish the defendant with the substance of any such oral report and conclusion. . . .

In *Hutchins v. State,* 101 Md.App. 640, 649–51, 647 A.2d 1271 (1994), we said:

> Rule 4–263(b)(4) is based on the recognition that the prosecutor is not always able to determine what is exculpatory or what is material to the defense. It avoids trial by ambush. If an agent of the State has consulted an expert, the defendant is entitled to disclosure of that expert's conclusion.

> This disclosure obligation is easy to satisfy. It relieves the State of any obligation to determine what conclusions are exculpatory or material to the defense. *It is limited to disclosure of "any . . . oral or written reports by (the*

*expert)* ... *not the sum and substance of (the expert's) proposed trial testimony."* State v. Wadlow, 93 Md.App. 260, 273, 611 A.2d 1091 (1992), *aff'd* in part and *rev'd* in part on other grounds, *Wadlow v. State,* 335 Md. 122, 642 A.2d 213 (1994).

\* \* \*

The appropriate remedy for a discovery violation is properly left to the sound discretion of the trial judge, whose remedy of choice will be affirmed on appeal unless the reviewing court is persuaded that the trial court abused its discretion.

*Id.* at 649–651, 647 A.2d 1271 (emphasis added, footnotes omitted).

The record in this case shows that defense counsel were provided with Mr. Chiafari's complete reports long before trial and the defense counsel were also allowed to meet with Mr. Chiafari and ask him questions prior to the commencement of trial. Moreover, as we said in *Hutchins,* the State was not required to provide appellants with the "sum and substance of (the expert's) proposed trial testimony"—just the oral and written reports of the expert. Additionally, the record reveals that appellants had retained their own DNA experts, who testified at the first trial. Canela could not possibly have been surprised or "ambushed" by Mr. Chiafari's testimony that when a person puts on gloves, that person leaves skin cells on the fabric and that those skin cells will mix with blood cells from blood that stains the glove. After all, defense counsel were supplied with a copy of Mr. Chiafari's report that gave his opinion that micro-vacuum samples taken from the interior surfaces of the gloves yielded DNA that was consistent with the three victims as well as DNA consistent with that of the appellants. From this it was fair to assume that Mr. Chiafari would be asked the questions here at issue. Under such circumstances, we hold that Maryland Rule 4–263(b)(4) was not violated.

As mentioned previously, Canela also contends that Chiafari was not qualified to testify as to the effect of porous

glove material on the intermingling of blood and skin cells. This contention will not detain us long. "To qualify as an expert, one need only 'possess "such skill, knowledge, or experience in that field or calling as to make it appear that [the] opinion or inference will probably aid the trier [of fact] in his search for truth." ' " *Thanos v. State,* 330 Md. 77, 95, 622 A.2d 727 (1993) (quoting *Radman v. Harold,* 279 Md. 167, 173 n. 2, 367 A.2d 472 (1977) (quoting *McCormick on Evidence* § 15, at 28–29 (1954))). Mr. Chiafari was accepted as an expert in forensic DNA analysis. He had testified as an expert in forensic analysis of DNA in the District of Columbia, Maryland and three other states. It is obvious that such an expert would have knowledge of how DNA is deposited and recovered. He testified without objection as to how the weave of fabric could affect the ability to recover trace DNA evidence. We therefore hold that the trial court did not abuse its discretion in deciding that Mr. Chiafari was qualified to give an opinion concerning the transfer of DNA through fabric.

In a closely related argument, Canela asserted that Mr. Chiafari was not qualified (or even accepted by the court) as an expert in the area of "the effect of porous glove material on the intermingling of blood and skin cells." Although he does not say so explicitly, Canela impliedly argues that a person accepted as an expert in forensic analysis of DNA was not qualified to give such an opinion. We reject that (implied) argument. Forensic DNA experts make their living examining DNA from blood and skin cells left on cloth and other materials. The opinion at issue was therefore clearly within the field of expertise of a forensic DNA expert.

## VII.

### First Issue Raised By Perez Only

As mentioned earlier, when Perez was interviewed by detectives at homicide headquarters, he told them that he along with Canela arrived at the victims' apartment at around 4:20 p.m. on the date of the murders. In his statement he said that he waited in the car while Canela went into the apart-

ment; that Canela stayed in the apartment some twenty minutes and then emerged through a window but without his shirt; that Canela climbed over a fence; that Perez then picked Canela up in a school yard; and that the two then went to Fells Point.

On June 22, 2006, which was the date that the second trial was set to commence, counsel for Perez sent the trial judge an email that he characterized as containing "pre-trial motions." The motion asked the court to sever Perez's trial from Canela's or, in the alternative, exclude entirely the statement Perez made to the police. The trial judge allowed Perez's counsel to argue these motions on June 22nd.

Counsel for Perez recognized that the statement, as given by his client, could not be admitted into evidence in its entirety because to do so would violate the rule enunciated in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (a co-defendant's confession that inculpates a non-confessing defendant is inadmissible). *See also State v. Gray*, 344 Md. 417, 433, 687 A.2d 660 (1997), *vacated on other grounds and remanded*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). Perez's counsel argued that he would be prejudiced if the statement was redacted because a redacted statement was not what his client said, and because he could not question the officers about the statement without violating principles of law set forth in *Bruton*. He therefore asked that Perez's trial be severed from that of Canela. In the alternative, he argued that the statement should be excluded completely because "the statement says A, when you redact it, it doesn't say anything near A, it says B, [and] changes the whole context of the statement." The trial judge, after reviewing the cases cited by Perez's counsel, denied the motion to sever and also denied Perez's "motion to exclude the presentation of a redacted statement."

The statement made by Perez to the police, in a redacted form, was introduced into evidence on July 19, 2006. On that date, the Prosecutor announced at a bench conference that she was calling Detective Massey to read to the jury the statement

in redacted form and that she planned to give each of the jurors a redacted written copy of the statement. Perez's counsel was asked if he had any objection to that procedure. Counsel said that he had "no problem with the jury having it [i.e., a copy of the redacted statement] in front of them here, but not all fifteen copies back there." The prosecutor then handed out to all the *venirepersons,* including alternates, a copy of the redacted statement. Sergeant Massey, without objection, then read the redacted statement to the jury.

In its redacted form, Perez recounted that he went to his brother's home at 7010 Park Ave., Apt. G-1, and he got there at approximately 4:20 p.m., driving his own car. Upon arrival at Ricardo Sr.'s apartment, he parked his car near a dumpster and stayed in the car. He did not say how long he stayed there. He then left the vicinity of Ricardo, Sr.'s apartment and drove to Broadway Avenue, where he got out of his vehicle and took a walk. While walking, a relative, whose name was "Alberto," called Perez on his cell phone. Perez answered and was advised by Alberto "that a mishap had happened" at Ricardo, Sr's. house. According to his statement, Perez, who was a good distance from his car, then went back to his vehicle and drove directly to Ricardo, Sr.'s apartment. When he arrived at the apartment he was told that "something bad, tragic happened." Once he received this bad news, he did not tell anyone that he had been to the apartment earlier that afternoon. Instead, he kept silent "out of fear" because he was afraid of what Ricardo, Sr.'s reaction might have been if the father had found that he (Perez) had been there that day.

In his statement that was read to the jury, Perez also acknowledged that he had been to Ricardo, Sr.'s apartment "last Tuesday." [10]

The State contends, citing Maryland Rule 4–323(a), that the challenge Perez now raises to the introduction of the redacted statement he made to the police is not preserved for

---

10. The murders occurred on Thursday.

appellate review because Perez's counsel did not make a contemporaneous objection at the time the statement was admitted into evidence. We agree with the State. *See Boyd v. State,* 399 Md. 457, 478, 924 A.2d 1112 (2007) (under Maryland law an *in limine* ruling admitting evidence ordinarily does not affect the requirement of Maryland Rule 4–323(a) that a contemporaneous general objection be made when the evidence is introduced). When the *in limine* motion is made immediately prior to the admission of the challenged evidence, however, an exception to the usual rule applies. *See Clemons v. State,* 392 Md. 339, 362–63, 896 A.2d 1059 (2006). The exception, however, is very narrow. *Washington v. State,* 191 Md.App. 48, 90, 990 A.2d 549 (2010) (collecting cases). The exception is here inapplicable because the motion *in limine* in question was ruled upon almost one month prior to the point in the trial when the statement was introduced into evidence. *See id.* We therefore hold that Perez has not preserved for appellate review the issue of whether the trial judge erred in admitting into evidence his redacted statement.

■ But even if Perez's current claim had been preserved, it would fail on its merits. According to Perez,

> what the jury heard instead [of his actual statement] was the nonsensical and self-impeaching statement that [Perez] drove to an apartment, sat in his car for 20 minutes, and then left. As redacted, the statement was highly incriminating, not just because it placed [Perez] at the scene near the time of the murders, but also because it was pointedly false making [Perez] look like a liar to the jury.

The redacted statement the jury heard was certainly incriminating because it placed Perez at the scene of the crimes at the approximate time the murders were committed. Nevertheless, the statements were not misleading. Contrary to Perez's argument, the redacted statement did not say that Perez sat in his car for twenty minutes outside the apartment where the murders were committed. In the redacted statement, there is no indication as to how long he sat there. And, if one reads only Perez's redacted statement, there is nothing

"nonsensical" about Perez's version of events. In fact it appears to be less incriminating than the unredacted statement.

Finally, nothing in the redacted statement distorted the meaning of the statement Perez made to the police or excluded any substantively exculpatory information. *See Cantine v. State*, 160 Md.App. 391, 408, 864 A.2d 226 (2004) (redacted statement properly admitted where, to the extent original statement was exculpatory, redacted version conveyed same information).

## VIII.

### Second Issue Raised By Perez Only

Perez argues that the motions judge deprived him of a fair trial by "unduly restricting his cross-examination of witnesses" at the suppression hearing concerning "matters relevant to whether [Perez] was in custody when he gave his statement." In support of this argument, Perez points to numerous rulings made by the motions judge, which we will discuss *seriatim*.

Perez first complains that the motions judge improperly sustained an objection when his counsel asked Detective Bradley whether he (Bradley) thought it was suspicious that a witness had seen Perez and Canela peeping in windows before the murders. The motions judge did not err when he sustained that objection. Detective Bradley had previously testified that in his view if someone was peeking in a window he would "want to know why," which, implicitly at least, strongly suggests that he thought that it was "peculiar." Moreover, the dispositive issue that was before the motions judge was whether Perez and/or Canela was arrested prior to the time they gave their statements to the police at homicide headquarters. Whether Detective Bradley thought it was "peculiar" that Perez had been seen peeping in windows prior to the murders was completely irrelevant to that issue.

Perez next complains that the motions judge improperly sustained the prosecutor's objection to a question directed to

Detective Bradley as to whether the detective knew that Perez had a car available to him at the point that he (Bradley) made arrangements to have Perez transported to the homicide office. The motions judge did not err when he sustained the prosecutor's objection to that question, because the answer would have been repetitive. Detective Bradley had previously testified that Perez told him during the interview in the conference room at the apartment complex that he had driven to the complex; Detective Bradley also testified that Perez actually pointed out his car to him. Therefore, it was quite obvious that the detective knew that Perez could have driven himself to police headquarters.

The remainder of Perez's complaints deal with the (allegedly) improper restrictions the motions judge placed on Perez's counsel's cross-examination of Detective Diaz. Prior to Detective Diaz's testimony, Detective Massey had testified that he filled out almost all the entries in the activity log concerning the interrogation of the appellants. After Detective Diaz testified that most of the activity log was prepared outside of his presence, he was asked by Perez's counsel which officers were present when various parts of the activity logs were filled out. The motions judge did not err in sustaining that objection. For starters, a witness who was not present when most of the entries were written would not have first-hand knowledge sufficient to intelligently answer the question. In any event, the issue of who was present when the logs were filled out was irrelevant to the issue that the motions judge was called upon to resolve, i.e., whether Perez was arrested at any point prior to giving the statement. The relevant question would have been who was present when the various activities mentioned in the log took place.

Perez next complains that the motions judge committed reversible error when the judge did not allow Detective Diaz to answer when he was asked what questions were asked of Perez before he was advised of his *Miranda* rights. We can find no such restriction in the portion of the transcript to which Perez has referred us. A review of the motions hearing

record reveals that the motions judge permitted extensive cross-examination of Detective Diaz regarding what was said to Perez before the latter was given *Miranda* advisements. The court did sustain an objection to an inquiry as to what questions were posed *after* the *Miranda* waiver, but before taping began. The motions judge emphasized that he was making this ruling on the grounds that it was irrelevant to the issue of whether the *Miranda* waiver had been voluntarily given. Immediately thereafter, the judge said that he was making this ruling based on his current understanding of the question before him, i.e., the voluntariness of waiver and the admissibility of Perez's statement. The judge said, however, "we invite counsel to be more clear as to the basis of his challenge to the procedure." The court then noted that counsel had declined to be more specific other than to say "the Fifth and Fourth Amendments that's all we have at this point." Despite the invitation of the motions judge, Perez's counsel, although he noted his continuing objection, declined to offer the court any reason why the issue might be relevant. Under such circumstances, we hold that the court did not abuse its discretion.

Appellant complains that the motions judge erred by not allowing Detective Diaz to answer when counsel asked him, on cross-examination, what was written in his notes concerning the interrogation of Perez. We need not decide this question because Perez's counsel withdrew this question after the hearing judge explained his ruling on the matter.

Perez also contends that the motions judge committed reversible error when he made "disparaging comments" concerning Perez's counsel's cross-examination and when he denied Perez's motion to have the testimony of the witness stricken on that ground. Once again, we find no merit in these complaints. The motions judge did say that Perez's counsel was attempting to put words in a witness's mouth. That comment certainly did not warrant the striking of the witness's testimony, nor did it constitute reversible error. The other comment, about which appellant complains, was that

after Perez's counsel asked a question, the judge simply attempted to clarify that question.

In sum, we hold that the motions judge did not deprive Perez of a fair trial "by unduly restricting his cross-examination of witnesses concerning any matter 'relevant to whether [Perez] was in custody when he gave his statement.' "

## IX.

### Third Issue Raised By Perez Only—
### Spoliation of Evidence

 At trial Perez's counsel asked that the trial judge instruct the jury in conformity with Maryland Civil Pattern Jury Instruction 1:10, which deals with spoliation of evidence. That pattern jury instruction reads:

The destruction of or the failure to preserve evidence by a party may give rise to an inference unfavorable to that party. If you find that the intent was to conceal the evidence, the destruction or failure to preserve must be inferred to indicate that the party believes that his or her case is weak and that he or she would not prevail if the evidence was preserved. If you find that the destruction or failure to preserve the evidence was negligent, you may, but are not required to, infer that the evidence, if preserved, would have been unfavorable to that party.

To understand why Perez's counsel wanted a spoliation of evidence instruction, a few additional facts must be added. The police executed a search directed at Perez's car on May 28, 2004. Inside the trunk of the car police officers found, *inter alia,* a white plastic bag containing a pair of jeans. The police removed the jeans from the bag, but the plastic bag was left inside the car's trunk. Later, the jeans were tested and found to contain a mixture of blood that was consistent with the victims' and Canela's DNA.

Detective Diaz executed another search and seizure warrant of Perez's car in October 2004. At that point the car was being stored in a Baltimore City impoundment lot. One of the

items Detective Diaz was looking for was the white plastic bag. During the execution of that warrant, Detective Diaz noticed that the trunk of the car had been "ransacked," and the white plastic bag was missing.

Perez argues that the "[p]olice acted negligently, at best, in removing a crucial piece of evidence in a triple murder case to an open lot where it was guarded fecklessly as to allow it to be ransacked, which Detective Diaz testified was 'not uncommon.'" Perez goes on to argue that the fact that the State's own forensic investigator made the decision to return to the car twice to look for specific additional evidence establishes the element of prejudice. Based on that premise, appellant concludes that "the trial court was wrong in concluding that the instruction was not generated" by the evidence.

As can be seen, the proposed instruction concerned a possible evidentiary inference that could be drawn from missing evidence. The holding by the Court of Appeals in *Patterson v. State,* 356 Md. 677, 741 A.2d 1119 (1999), governs this last issue raised by Perez. In *Patterson,* the Court noted that, whereas "Maryland Rule 4–325(c) imposes a requirement that instructions be given in respect to the applicable law in a case[,] [i]t does not apply to factual matters or inferences of fact." *Id.* at 684, 741 A.2d 1119. The Court went on to say:

> An evidentiary inference, *such as a missing evidence* or missing witness inference ... is not based on a legal standard but on the individual facts from which inferences can be drawn and, in many instances, several inferences may be made from the same set of facts. *A determination as to the presence of such inferences does not normally support a jury instruction.* While supported instructions in respect to matters of law are required upon request, instructions as to evidentiary inferences normally are not.

*Id.* at 685, 741 A.2d 1119 (emphasis added).

The *Patterson* Court concluded as follows:

> When evidence is missing, apparently due to the act or omission of one of the parties, an inference that the evi-

dence would have been unfavorable to that party may be appropriate. That is all that is required. . . .

\* \* \*

We now further refine the issue in the case *sub judice* by holding that, *regardless of the evidence, a missing evidence instruction generally need not be given; the failure to give such an instruction is neither error nor an abuse of discretion.*

*Id.* at 688, 741 A.2d 1119 (emphasis added). *See also Lowry v. State,* 363 Md. 357, 373–75, 768 A.2d 688 (2001) (party may argue missing evidence inference to jury, but is not entitled to instruction); *Sessoms v. State,* 357 Md. 274, 282 n. 3, 744 A.2d 9 (2000) (same as to missing witness inference); *Keyes v. Lerman,* 191 Md.App. 533, 546, 992 A.2d 519 (2010) (Rule applied in *Patterson* that missing evidence instruction need not be given is also applicable in civil cases).

As can be seen from the authorities above cited, the trial court did not err in failing to give the spoliation of evidence instruction requested by Perez.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID FIFTY–PERCENT (50%) BY ADAN ESPINOZA CANELA AND FIFTY–PERCENT (50%) BY POLICARPIO ESPINOZA PEREZ.**